Stephen R. Harris, Bar No. 1463
BELDING, HARRIS AND PETRONI
417 West Plumb Lane
Reno, Nevada 89509
Telephone: 775-786-7600
Facsimile: 775-786-7764
Email: steve@renolaw.biz

Alan D. Smith, WSBA No. 24964
Brian A. Jennings, WSBA No. 32509
PERKINS COIE LLP
1201 Third Avenue, 48th Floor
Seattle, WA  98101-3099
Telephone:  (206) 359-8000
Facsimile:  (206) 359-9000
Email:    ADSmith@perkinscoie.com
          BJennings@perkinscoie.com
Attorneys for Debtors and Debtors-in-Possession

E-Filed 4-26-06

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>PTI HOLDING CORP.,et al.,<br><br>         Debtors. | Case Nos. 06-50140 through 06-50146<br>Administratively consolidated under:<br>CASE NO. 06-50140 |
| HOMESTEAD HOLDINGS, INC.,<br><br>         Plaintiff,<br><br>    v.<br><br>BROOME & WELLINGTON<br><br>         Defendant. | Adversary Proc. No. 06-05051-gwz<br><br>DECLARATION OF DAVID<br>GREENSTEIN IN SUPPORT OF MOTION<br>FOR PRELIMINARY INJUNCTION<br><br>Hrg. Date:  June 1, 2006<br>Hrg. Time:  1:30 p.m. |

DECLARATION OF DAVID GREENSTEIN IN
SUPPORT OFF MOTION FOR PRELIMINARY
INJUNCTION - 1
[00000-0000-000000/SB061090 246 (2)]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Phone:  (206) 359-8000
Fax:  (206) 359-9000

DAVID GREENSTEIN, declares and says:

1.      I am Chief Executive Officer ("CFO") of Homestead Holdings, Inc. ("Homestead") and each of its affiliates that are debtors and debtors in possession in these proceedings (collectively, the "Debtors").[1]  In this capacity, I am generally familiar with Debtors' operations, businesses and financial affairs.

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based on experience, knowledge, and information concerning Debtors' operations.  If called upon to testify, I would testify competently to the facts set forth in this declaration.

2.      Broome & Wellington ("B&W") is a company based out of Manchester, England, that is engaged in the distribution of textiles throughout the world, including to customers in the United States.  Upon information and belief, non-parties Herkimer Distribution LLC ("Herkimer") and Homestead Fabrics, Ltd. ("Fabrics") are owned and/or controlled by B&W and have at all relevant times been acting in concert with B&W.

3.      Fabrics formerly was a corporation organized under the laws of England and Wales that was sixty five percent (65%) owned by B&W and thirty five percent (35%) owned by Findhorn, Ltd., a corporation owned by Steven Greenstein ("Steven") and me.

4.      Pursuant to a series of transactions, a substantial portion of Fabrics' assets were sold to Homestead, including without limitation all current and future orders, customer lists, business relationships, contracts or purchase orders, order books, inventory ordered but not yet

---

[1] Debtors include the following: Homestead Holdings, Inc., The Mounger Corporation, Pacific Trail, Inc., PTI Holding Corp., PTI Top Company, Inc., London Fog Group, Inc., and The Scranton Outlet Corp.

DECLARATION OF DAVID GREENSTEIN IN
SUPPORT OFF MOTION FOR PRELIMINARY
INJUNCTION - 2

[00000-0000-000000/SB061090 246 (2)]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Phone:  (206) 359-8000
Fax:  (206) 359-9000

paid for, licenses, tradenames, trademarks, patents, designs and copyrights, and all assets of Fabrics' subsidiary corporation in the United States (the "Assets").

5. More specifically, the Assets were transferred from Fabrics to Homestead as follows:

a. Steven and I caused Findhorn, Ltd. to assign its shares in Fabrics (constituting 35% of outstanding shares) back to Fabrics, making B&W the sole shareholder of Fabrics;

b. Pursuant to an agreement dated as of September 8, 2004, a copy of which is attached hereto as Exhibit A (as amended, the "Sale Agreement"), Fabrics sold the Assets to Homestead as designee of Greenco, a Delaware corporation owned by Steven and me;

c. Steven and I guaranteed Greenco's performance under the Sale Agreement;

d. Pursuant to that certain Exchange Agreement attached hereto as Exhibit B and related documents (collectively, the "Exchange Agreement"), Greenco transferred to London Fog Group, Inc. ("LFG") all of Greenco's shares of stock in Homestead in exchange for approximately 60% of outstanding shares of LFG;

e. Pursuant to that certain Assignment of Rights Agreement, a copy of which is attached hereto as Exhibit C, Homestead assumed all of Steven's and my rights and obligations under the Sale Agreement including obligations to and rights against B&W and Fabrics.

6. Following the foregoing transactions, (a) Steven and I were majority shareholders of LFG, (b) Homestead became a wholly-owned subsidiary of LFG, and (c) Steven and I were guarantors of Homestead's performance of any remaining obligations under the Sale Agreement.

7. As consideration for the Assets, Greenco agreed to assume certain liabilities relating to the Assets and to pay a purchase price in an amount to be determined based on certain contingencies. Those obligations were assumed by Homestead.

DECLARATION OF DAVID GREENSTEIN IN
SUPPORT OFF MOTION FOR PRELIMINARY
INJUNCTION - 3
[00000-0000-000000/SB061090 246 (2)]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone: (206) 359-8000
Fax. (206) 359-9000

8.    Much of the accounting information required to compute the amounts paid on account of the Assets is in the possession and control of B&W, Fabrics and Herkimer and has not been shared with Homestead despite requests to such effect.

9.    B&W and Fabrics have asserted that the sum of $7,018,709.28 remains due and owing.

10.    However, Homestead, Steven and I contend that all currently due portions of the purchase price have been paid in full (although the purchase price may be subject to further adjustment in the future) and that B&W in fact owes Homestead a significant sum, in an amount to be proven.

11.    On March 29, 2006, B&W filed a proof of claim, a copy of which is attached hereto as Exhibit D (the "Proof of Claim"), asserting a claim against Homestead in the amount of $7,018,709.28.  Although the Proof of Claim does not articulate the basis for the claim, the amount of $7,018,709.28 is the amount that B&W and Fabrics set forth in Exhibit E, referenced below, as the amount that remains due and owing under the Sale Agreement.

12.    By letter dated March 30, 2006, attached hereto as Exhibit E, Fabrics and B&W announced their intent to initiate an action in the Courts of the United Kingdom to recover the sum of $7,018,709.28 if it was not promptly paid.

13.    On April 4, 2006, Homestead filed its objection to the Proof of Claim, a copy of which is attached hereto as Exhibit F (the "Objection"), in which Homestead (a) objected to the Proof of Claim as insufficient under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, (b) denied that any amounts were due to B&W, (c) asserted a counterclaim against B&W in an amount to be determined at trial, and (d) requested that the Proof of Claim and Objection be treated as a complaint and answer and counterclaim and assigned an adversary proceeding number.

DECLARATION OF DAVID GREENSTEIN IN
SUPPORT OFF MOTION FOR PRELIMINARY
INJUNCTION - 4
[00000-0000-000000/SB061090 246 (2)]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Phone.  (206) 359-8000
Fax:  (206) 359-9000

14.    Also on April 4, 2006, the Office of the United States Trustee filed an amended notice of appointment of members of the Creditors Committee in which it added B&W as the seventh member.

15.    On April 18, 2006, Homestead initiated the present Adversary Proceeding by filing its Complaint in which it seeks (a) an order denying the Proof of Claim, (b) asserts a counterclaim against B&W, and (c) seeks injunctive relief prohibiting B&W, or anyone acting in concert with B&W, from commencing or continuing litigation or other actions against Greenco, Steven or me.

16.    Concurrently with this Declaration, Homestead is filing its Motion for Preliminary Injunction (the "Motion") in which it seeks an order enjoining B&W, or those acting in concert with B&W, from commencing or continuing litigation or other actions against Greenco, Steven or me pending the resolution of the Adversary Proceeding.

17.    The injunctive relief sought in the Complaint and in the Motion is necessary to prevent irreparable harm to Debtors.  The litigation requires a substantial commitment of time, money and energy.  Because B&W has threatened to commence its lawsuit in the United Kingdom, the litigation likely will be even more burdensome.  Steven and I, as Chief Operations Officer and Chief Executive Officer, respectively, are involved in virtually every aspect of the Debtors' businesses, including the daily operation of the businesses and strategic decision making.  I also lead the Debtors' sales efforts, which requires me to travel frequently to visit existing or potential customers.  If I am not able to continue these efforts, there is a strong likelihood that Debtors' revenues and businesses will suffer.

18.    One of Steven's primary responsibilities as Chief Operations Officer is coordinating the manufacture of Debtors' products.  This involves working with, and often

DECLARATION OF DAVID GREENSTEIN IN
SUPPORT OFF MOTION FOR PRELIMINARY
INJUNCTION - 5
[00000-0000-000000/SB061090 246 (2)]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Phone:  (206) 359-8000
Fax:  (206) 359-9000

visiting, Debtors' numerous suppliers, many of whom are located overseas. Steven's time and attention is absolutely necessary to maintaining working relationships with our suppliers.

19.     On top of those responsibilities, which consume most waking moments of Steven's and my days, we have additional responsibilities as a result of the reorganization process.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of April in Seattle, Washington.


                              s/ David Greenstein
                              David Greenstein

Presented by:

**BELDING, HARRIS & PETRONI, LTD.**


By      /s/ Stephen R. Harris
        Stephen R. Harris, Nevada Bar No. 001463

**PERKINS COIE LLP**


By      /s/ Alan D. Smith
        Alan D. Smith, WSBA #24964
        Brian A. Jennings, WSBA #32509
        Justin L. Moon, WSBA #36981
Attorneys for Debtors and Debtors in Possession

DECLARATION OF DAVID GREENSTEIN IN
SUPPORT OFF MOTION FOR PRELIMINARY
INJUNCTION - 6

[00000-0000-000000/SB061090 246 (2)]

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Phone.  (206) 359-8000
Fax.  (206) 359-9000

# EXHIBIT "A"

## AGREEMENT

Date: September 6 2004

Parties:

Homestead Fabrics Ltd., a corporation organized under the laws of England and Wales, 86, Princess Street, Manchester UK - (HMST)

Broome & Wellington, a limited partnership organized under the laws of England and Wales 86, Princess Street , Manchester UK - (B&W)

And

Greenco Enterprises Co., Inc. a Delaware corporation, c/o Anderson Kill & Olick, P.C., 1251 Avenue of the Americas, New York, New York USA (Newco) and

David Greenstein, of 1 Madison Avenue, Norwood, New Jersey, 07648 (David) and Steven Greenstein, of 32 Park Road, Prestwich , Manchester, UK (Steven, and together with David,- GR) individually and as guarantors (jointly and severally) of the obligations of Newco

And

London Fog Industries Inc., a Delaware USA corporation, 1700 Westlake Avenue North, Seattle, Washington, USA – (LFI) – or other reasonably satisfactory guarantor as provided in Paragraph 21.

Whereas, HMST is a UK based company manufacturing textiles products and selling them to retailers, primarily in the USA, and its operations are managed and controlled wholly from the UK, and

Whereas, the principal owners are B & W (65% of shares) and the remaining 35% are owned by Findhorn Ltd, an Isle of Man corporation, the shares of which are owned by David and Steven, and

Whereas, David and Steven have participated in the running of the operation of HMST (David is active primarily in the USA, meeting customers and generating sales, and Steven is based in the UK and supervises overseas

NYDOCS1-743081.2

manufacturing and production), and Newco, of which they are majority shareholders, desire to purchase directly or indirectly certain assets and business of HMST with effect as of September 1, 2004, as set forth below (the "Ongoing Business") and HMST desires to sell such Ongoing Business to Newco, and

Whereas, HMST, B&W, Joshua Rowe, David and Steven have agreed (by their respective signatures at the foot of this Agreement) that this Agreement, when it becomes binding and effective (clause 21), shall supersede and replace all prior agreements among them relating to the acquisition of HMST and its business and assets (other than in relation to the non-refundable deposit of $2 million already paid by David and Stephen to B&W), in particular the agreement dated May 21, 2004, as amended July 11, 2004, and

Whereas, David and Steven will, effective upon their respective execution of this Agreement, also become the joint and several guarantors of the obligations of Newco or any subsidiary thereof under this Agreement, and

Whereas, [LFi, or another guarantor as provided in Paragraph 21] upon terms reasonably satisfactory to B&W/HMST will, effective upon its execution of this Agreement and/or of an agreement of guaranty setting forth such terms, become an additional guarantor of the obligations of Newco or any subsidiary thereof under this Agreement,

Now, therefore, the parties hereto agree as follows:

1.    David and Steven agree to cause Findhorn to assign all of the shares held by it in HMST to HMST.

2.    HMST agrees to transfer to Newco ~~on behalf of David and Steven~~ the HMST name, rights to all current and future orders from HMST customers (in respect of the Ongoing Business), its customers lists, its business relationships, contracts or purchase orders with suppliers, order books (other than order books relating to its existing inventory), all inventory ordered (whether or not in transit or in warehouse) but not yet paid for by HMST, designs, license agreements for the Iron Man/Woman and Little Tykes trademarks and other product licenses as to which HMST is licensee (subject to the following sentence of this paragraph 2), tradenames, trademarks, patents, designs and copyrights, copies of HMST trading records, all as existing as of close of business on August 31, 2004 (constituting the Ongoing Business), as to all of which B&W/ HMST waive all rights of confidentiality with respect to GR/Newco and their affiliates.

If the transfer or assignment by HMST of a license agreement to Newco requires the consent of the licensor, HMST shall make every reasonable effort to effect such a transfer or assignment. In the event that such consent shall not be given, HMST will make necessary arrangements to provide Newco, at cost (including the additional costs of having to maintain the company and its operations), the goods or services to which HMST is entitled under the subject license and which Newco shall request.

~~NYDOCS1-743081.2~~NYDOCS1-743081.2

-2-

HMST agrees that Newco shall have the right to use software licenses and systems, - (whilst it remains on the HMST / B & W premises) which are presently in use at the offices of HMST, or the Herkimer Warehouse (for the duration of their 'utilisation' of Herkimer)- as defined below - and reasonably necessary for the performance by Newco of its obligations to HMST hereunder and for the continuation of the Ongoing Business.

3.    B&W will transfer to Newco all of its shares of Homestead Fabrics Inc., a Delaware, USA corporation, for no additional consideration. Newco will grant B&W / HMST the right to use the name Homestead Fabrics for no additional consideration, in connection with liquidation of the assets of HMST being liquidated hereunder, as well as all HMST's tradenames, trademarks, patents, designs and copyrights, and trading licenses, to assist in such liquidation, for no additional consideration, until the earlier of completion of such liquidation of its assets or the payment by Newco of the Aggregate Amount, as defined in paragraph 5 below.

4.    To assure the payment of the amounts to be paid by Newco pursuant to paragraph 5 below and until the same shall have been paid in full, HMST retains ownership of all receivables (the "HMST Receivables") and all inventory in the warehouse or in transit and paid for by HMST (the "HMST Inventory") as of 1st September 2004. HMST appoints Newco and Newco agrees to act as its agent for, and recover optimal value with respect to:

(a)    the collection of the HMST Receivables, and

(b)    the sale of the HMST Inventory,

all on HMST's behalf.

If HMST arranges any sales on its own behalf, it shall do so in consultation with NEWCO giving them the possibility to obtain a better price.

To the extent that an order by a customer of HMST shall be fulfilled out of either HMST Inventory or Newco inventory for at least 90% of the invoiced value, with the balance to be filled from the inventory of Newco or HMBT, as the case may be, Newco shall provide the address of the supplier of 90% or more of invoiced value to the customer as the remittance address; and, upon collection of such account, the other party shall have a credit therefrom in proportion to the invoiced value of the goods furnished by it. To the extent that any such order is Not fulfilled  from   90% of invoiced value from either HMST Inventory or Newco Inventory, then Newco shall provide the remittance address as a lock box for which the parties shall have physical access only concurrently, and from which funds may be withdrawn out of collections only upon joint signature in proportion to the invoiced value of the goods furnished by the parties. Newco shall give notice to its factors or other lenders, if any, of the respective interests of the parties in any invoices covering sales of inventory of both HMST and Newco and shall not pledge or grant any security interest in proceeds of accounts allocable to HMST.

NYDOCS1-743081.2NYDOCS1-743081.2

-3-

For the purpose hereof, receivables arising out of the sale of HMST Inventory on and after September 1, 2004 shall be deemed HMST Receivables ~~and the appropriate 'securitisation' of its receivables (similar to the arrangement made with factors, will be put into place)~~also subject to a security interest in favour of HMST.

Customer orders will always be fulfilled first from HMST stocks and/then from NEWCO stocks (i.e. on a FIFO basis)

5.      Newco will remit to HMST all proceeds, and shall be obligated to turn over or pay to B&W / HMST such amounts as will provide $27 million to HMST as a net balance as described below whether derived in whole or in part from collections (net of accrued royalties and sales commissions, charge-backs, claims, discounts, allowances and rebates) of HMST Receivables and from sale of HMST Inventory and/or sale or purchase of the Herkimer Warehouse - defined below - as set forth below, or from Herkimer tax refunds or from other funds). Such amount (Aggregate Amount) of $ 27 million shall be the net balance available to HMST, after HMST shall have paid out its current liabilities (including taxes due/or payable) on the books as at 31 July 2004 (as listed in the schedules appended hereto) of $6.5 million and after B&W shall have been paid any net balances owing by HMST/ Herkimer Distribution LLC (Herkimer) in the 'inter company' accounts on the books of HMST/Herkimer as at 31 July 2004 of $1.2 million (as adjusted for revenues received by B&W on behalf of HMST and expenses paid and payable and taxes paid or payable by B&W on behalf of HMST attributable to the month of August 2004 as set forth in Clause (ii) below), i.e. after a total of $33.7 million, (with said adjustments for August 2004) shall have been paid or credited to B&W/HMST.

The following shall be credited towards the ~~aggregate amount;~~Aggregate Amount:

(i)     The parties acknowledge that $2 million has already been received by B&W as a non refundable deposit on behalf of Newco, which shall be credited against the Aggregate Amount.

(ii)    The parties acknowledge that all expenses which have been paid during August 2004 or are payable for August 2004 for or by HMST out of B&W accounts, plus any taxes paid during or payable for such month, will be reconciled against proceeds of HMST Receivables collected in such month (net of all royalties, sales commissions, charge-backs, and the like, as referred to above) so as to result in a new "intercompany" net balance for HMST/Herkimer as of August 31, 2004, which balance may be in favor of and owing to B&W, ( in which case, the gross sum payable to B&W / HMST of $ 33.7 million will be increased), or may be in favor of HMST/Herkimer and give rise to a credit to Newco, (in which case, such

~~NYDOCS1-743081.2~~NYDOCS1-743081.2

-4-

> amounts will be credited towards the Aggregate Amount).

> (iii) There shall be a further credit, relating to sale of the warehouse-distribution centre operated by Herkimer (Herkimer Warehouse) or Herkimer, as the case may be, under conditions described below.

6.    The parties agree and acknowledge (a) that, except as expressly provided herein, the amount of HMST current liabilities which Newco will be responsible to fund shall be $5.5 million which is an 'agreed' and 'fixed' figure (as set forth on HMST accounts as of July 31, 2004) and that revenues and expenses for August 2004 shall be reconciled in intercompany accounts pursuant to paragraph 5 (ix); and (b) that Newco will additionally pay for any severance payments for which HMST may be obligated in its UK offices and incurred by B&W/Herkimer and for any severance payments in the USA showroom/Herkimer Warehouse incurred by B&W/Herkimer.

7.    As of 1st April 2005, an account will be drawn up of payments remitted by Newco to HMST and interest will be charged on the difference between the (net) amounts remitted to HMST and $23 million. The figure of $23 million is used, and not $27 million, because it is envisaged that the Herkimer Warehouse (including plant and equipment) - which for the purposes of this Agreement is valued nominally at $4 million - and which Newco has the right to utilize (on terms set forth in paragraph 10 below), will be so utilized, in which case such nominal figure earns no interest. If for some reason, Herkimer is not utilized by Newco, or such use is terminated, then the figure of $23 million is replaced by the figure of $27 million for the purposes of the above calculations of interest for the relevant period. The rate of interest will be based on Prime rate plus 4% and is payable quarterly. Interest payments are not credited against the Aggregate Amount.

8.    Newco shall provide services to HMST, at no additional charge, for ~~assisting in~~ the collection of its Receivables and sales of its Inventory such services to commence on or as of September 1, 2004. All collections are to be promptly deposited in HMST bank accounts, and all sales of HMST Inventory are to be invoiced with remittance addresses as provided in Paragraph 4 above. \

9.    By no later than by 1st September 2007 (and time is of the essence), GR / Newco hereby undertake to pay to HMST (or such person as HMST shall nominate) all such amounts as are required in order to attain this Aggregate Amount of $27 million (after payment of HMST current liabilities of $5.5 million, settlement of inter company accounts as of July 31, 2004 of $ 1.2 million, as the same may be reconciled as of August 31, 2004 as referred to in Paragraph 5 (ii) above herein provided).

10.    ~~(a)(a)~~ B & W will provide the services of the Herkimer warehouse for a fee of $ 500,000 per annum, payable monthly, for a term of one year commencing September 1, 2004, renewable, by NEWCO, (subject to sub clauses (b) and (c)) for two ~~NYDOCS1-743081.2~~NYDOCS1-743081.2

-5-

additional one year terms at the same fee, upon three (3) months notice prior to expiration of each term. In addition, Newco shall be responsible to pay all operating costs, on a monthly basis, including, but not limited to, labour, management, materials, computer and software and hardware maintenance and upgrades and all routine building maintenance, repairs (structural repairs or improvements being expressly excluded) and insurance, and state and local taxes (other than income taxes) during the term, (none of these above mentioned amounts shall be credited towards the Aggregate Amount) and it shall be entitled to all refunds, rebates or credits in respect of any state and local taxes, which shall, if received by Newco, be paid over to B&W and all of which, including such as may be received by Herkimer/HMST/B&W, shall be credited against the Aggregate Amount.

The parties acknowledge that the computer system in Herkimer is antiquated / out of date and was due for replacement. Whilst it is still operational, it may need replacing or upgrading and such costs will be borne by NEWCO, if they wish to continue utilising the facility.

(b)    B&W and/or Herkimer shall have the right at any time on or after September 1, 2005 to sell the Herkimer Warehouse, but shall notify GR/Newco of its/their intention of the price desired, and Newco shall have a right of first refusal to make such purchase at such price. If the parties shall not have reached agreement within 30 days, B&W and/or Herkimer may thereafter accept any other offer, provided that GR/Newco shall again have a right of first refusal on a proposed selling price which is lower than $4 million.

(c)    Should B&W sell said property to a third party prior to September 1, 2007, B&W will give Newco at least six months notice to vacate the real estate.

(d)    If B&W/Herkimer shall sell the Herkimer Warehouse, and the Aggregate Amount shall not yet have been attained, B & W shall apply the proceeds of such sale towards any shortfall in the Aggregate Amount (subject to the parties first having achieved optimal values for the HMST receivables and HMST inventories) and the balance thereof shall be retained by B&W / Herkimer.

(e)    If the Herkimer Warehouse is not sold prior to September 1, 2007, then upon payment by Newco of all remaining obligations under this agreement on or before such date, B&W will transfer the Herkimer Warehouse to Newco in an "as is" condition, without any further consideration.

If, for example, the liquidations of HMST Receivables and inventory have yielded only $20 million against the Aggregate Amount (the parties having achieved the optimal referred to above) and Herkimer Warehouse brings $10 million in proceeds of a sale (net of taxes and expenses of sale), then B&W/Herkimer shall apply $7 million of such proceeds towards the Aggregate Amount (thereby releasing Newco and acquisitions from any further liability in such regard) and retain the balance for itself.

NYDOCS1-743081.2NYDOCS1-743081.2

-6-

~~(f)      If (i)(I) HMST shall not have attained the Aggregate Amount and Newco or any guarantor shall not have made arrangements for and paid any shortfall thereunder on or before September 1, 2007 and (ii)(II) the Herkimer Warehouse shall not have been sold prior thereto to Newco or any other party, then, besides all other legal remedies in favour of HMST and/or B&W, B&W shall have the right at any time thereafter to sell the Herkimer Warehouse and apply the proceeds thereof towards the Aggregate Amount and any balance is retained by B & W / Herkimer~~

11.     If Newco shall default in any payment when due , HMST shall have the right either to apply or increase the rates of interest on the amount due to Prime plus 9%, or to demand immediate payment of all outstandings.

12.     From September 1, 2004, Newco shall conduct the Ongoing Business for its own account and shall acquire from HMST and pay for inventory not yet paid for by HMST as of close of business on August 31, 2004, enter into new business, fill customer orders unfilled as of such date, and engage future commitments (buying and selling ), plus create new contracts, etc., invoice and collect its own cash. Newco shall be responsible for its own account for all expenses, including sales commissions, markdowns, chargebacks, royalty payments etc not previously accounted / accrued for in the 31 July 2004 and 31 August figures) ,

NEWCO will replace the B&W deposit and take over the lease for the 230 Fifth avenue showroom. The replaced deposit shall not go as a credit towards the Aggregate Amount but NEWCO will receive the office computers in the showroom. The design computers and equipment however, shall remain a part of the Herkimer assets.

Newco shall have the right, for a period of 60 days from the effective date of this Agreement, at the same cost as directly incurred by HMST therefor, to continue to use facilities, including computer hardware and software and machinery and equipment, presently used by B&W/HMST in Manchester UK and to continue to employ the persons currently assigned to HMST or have the services of all such personnel located there as it selects subject to the usual B&W approval. After such 60 day period, Newco shall have the right to offer employment to John Ritson, Roger, Bryan, Jonathan, Amanda, Karen as it selects (and in the case of Toni Raven, only after all HMST liquidation will have been fully completed) but not to any other person currently employed in the UK office.

13.     So long as Newco's obligation for the Aggregate Amount (as adjusted) remains unpaid, HMST will, retain reasonably adequate staff (including, Bernard, Toni, perhaps some nominated persons in Herkimer and the accounts department in Manchester) to manage the 'run down' and liquidation of all HMST assets, and Newco shall pay to HMST the (progressively reducing) costs on a monthly basis of all salaries and benefits of such personnel except in the case of Bernard, for which 50% of such costs will be paid, plus all office and associated costs. (Such amounts will not be applied toward the Aggregate Amount)

NYDOCS1-743081.2NYDOCS1-743081.2

-7-

HMST will maintain adequate insurance, including, fire, theft, and other customary loss coverage on HMST inventory (At the moment, insurance cover is based on cost + duty + 40%) and discharge the agreed current liabilities, cooperate with Newco with regard to notice to customers and suppliers, and assist Newco in obtaining the consents or approval of third parties for assignment to Newco of license agreements and other contracts and orders. All insurance recoveries for inventory losses shall be treated as collections by Newco of HMST Receivables in the amount of such recoveries and applied toward the Aggregate Amount.

14.    GR / Newco (or its successors in interest or affiliates, as the case may be) will pay 3% royalty payments to HMST (or to any entity it nominates) on all Iron Man and Iron Girl sales (including on sales to WTC where no royalty is payable to WTC) . Terms and rights (other than 'minimums') will mirror the terms and rights currently in place with WTC.

15.    If there is a UK Inland Revenue challenge with respect to treatment of 'Management Charges' for tax purposes, such that HMST tax is restated for any period ending on or prior to July 31, 2004, David and Steven will be liable for that amount of additional tax assessed which is attributable and allocable to them.

16.    B&W and HMST each warrant and represent that HMST has good and marketable title to all HMST assets, including assets being conveyed to Newco hereunder, free and clear of any and all liens, security interests and other encumbrances; and that the financial statements of HMST as of July 31, 2004, and supporting books and records, as pertaining to HMST Receivables, HMST Inventory and other HMST assets the subject matter of this Agreement, are, to the best knowledge of B&W/HMST, complete and accurate.

17.    This Agreement shall be governed by and construed in all respects in accordance with the Laws of England and each party  hereby submits to the exclusive jurisdiction of the English courts

18.    {This Agreement is subject to review and revision by the parties with respect to tax planning matters, provided that any revision hereof for such purposes shall not materially alter the economic benefits hereof to be enjoyed by the respective parties.}

19.    All $ amounts are in US Dollars.

20.    Concurrently herewith, the parties agree that upon fulfilment of all obligations under this agreement, the parties will exchange mutual and reciprocal releases from any claims based on events or circumstances predating the date upon which this Agreement becomes effective as set forth below, which will include also release of London Fog Industries, David and Steven and any member of their family and affiliates of Newco and release of Joshua Rowe and any member of his family and affiliates of B&W.

NYDOCS1-743081.3NYDOCS1-743081.2

-8-

21.    This Agreement will be executed by GR/Newco, HMST, B&W and ~~Joshua Rowe,~~ thereby signifying their agreement in principle to this agreement ~~as set forth above.~~ This Agreement shall become binding upon the parties and effective only upon the (i) agreement of B&W/HMST and Newco as to the provision by [LFI], or [another person making working capital available to Newco and acting as a guarantor, which other person is reasonably satisfactory to such parties], of a guaranty of Newco's obligations and/or those of any subsidiary of Newco hereunder to B&W/HMST, all on terms reasonably satisfactory to B&W/HMST and Newco, and (ii) ~~signature~~ execution as a deed by such guarantor of this Agreement as guarantor and/or entry by such guarantor into an agreement of guaranty including such terms. The guarantors / ~~guarantees~~guaranties shall be ~~finalised~~finalized by no later than ~~20 September 2004.~~ ~~Time is of the essence~~14 days after the execution of this Agreement by ~~Joshua Rowe,~~ B&W/HMST and GR/Newco. Time is of the essence.

22.    The ~~Guarantee~~Guaranties and Indemnities

(a)    Steven and David and LFI, [or other guarantor] ("the Guarantors") hereby jointly and severally irrevocably and unconditionally guarantee to HMST and ~~BW~~B&W as principal obligors and not merely as surety the full and due performance by Newco of all its obligations under or pursuant to this Agreement (including under any deeds or other documents entered into pursuant to the terms of this Agreement).

The Guarantors hereby jointly and severally further indemnify HMST and BW against all losses, damages, costs and expenses or otherwise which may be suffered or incurred by HMST and ~~BW~~B&W / HMST by reason of any default on the part of Newco in fully performing and observing the terms and conditions on Newco's part contained in this Agreement, provided, however, that the maximum amount recoverable hereunder by HMST and B&W collectively, shall not exceed the amounts outstanding under the agreement

It is hereby agreed that any amendment to or variation of this Agreement or any neglect granting of time or other indulgence or forbearance on the part of HMST and ~~BW~~B&W to Newco or to any third party and whether or not pursuant to this Agreement (including under any deeds or other documents entered into pursuant to the terms of this Agreement) or any other act event or omission which but for this clause would operate to impair or discharge the liability of the Guarantors shall not release, discharge, impair or exonerate or in any way affect the liabilities of the Guarantors under this clause. This clause is a continuing guarantee and shall remain in force until all obligations of Newco under this Agreement have been fully satisfied. The Guarantors hereby waive any right they may have of first requiring HMST and ~~BW~~B&W to proceed against or enforce any claims against Newco or any other person.

For the avoidance of doubt it is hereby agreed that the liability of the Guarantors under this clause 22(a) is joint and several.

~~NYDOCS1-743081.2~~NYDOCS1-743081.2

-8-

~~(b)    HMST, B&W and Joshua Rowe hereby jointly and severally indemnify David Bleyen and Newco against all losses, damages, costs and expenses or otherwise which may be suffered or incurred by any of them by reason of any breach in the warranties and representations set forth in paragraph 18 hereof and terms and conditions on the part of either of them contained in this Agreement.~~

23.    Notwithstanding the whole or any part of any provision of this Agreement which may prove to be illegal and unenforceable, the other provisions of this Agreement shall continue in full force and effect.  In relation to any illegal or unenforceable part of this Agreement, the parties hereto agree to amend such part in such manner as may be requested from time to time by any of the parties hereto provided that such proposed amendment is legal and enforceable and to the maximum extent possible carries out the original intention of the parties in relation to that part.

If any part of this Agreement shall be held by any Court of competent jurisdiction to be unenforceable, such part shall be treated as being severable from the remainder of this Agreement.

24.    Any date or period mentioned in this Agreement may be extended by agreement between the parties hereto, failing which, as regards any such date or period, time shall be of the essence of this Agreement.

25.    It is hereby acknowledged by the parties that B&W may liquidate HMST following the collection of the HMST Receivables and HMST Inventory but prior to 1st September 2007.  In the event that the HMST is liquidated prior to 1st September 2007 and before all the obligations of Newco and the Guarantors or of HMST and B&W, respectively, under this Agreement have been met, the benefits of this Agreement (and/or any document entered into pursuant to it or in connection with it), including but without limitation the rights of HMST with respect to receive the HMST Receivables, HMST Inventory and the Aggregate Amount, and the rights of Newco with respect to Herkimer and the Herkimer Warehouse, may at any time and on more than one occasion be assigned, in whole or in part, for the benefit of B&W or HMST to any person whom HMST or B&W may nominate and such person shall assume any obligations of HMST/B&W in favour of Newco not theretofor met.  An assignee of these benefits has all the rights and benefits of the guaranteed amounts a per the agreement.

Dated: _____, 20

~~NYDOCS1-743081.2~~NYDOCS1-743081.2

-10-

IN WITNESS whereof the parties hereto have executed this document as a deed the day and year first before written.

SIGNED AS A DEED by                          )
BROOME & WELLINGTON                          )
acting by its general partner                )
JOSHUA ROWE in the presence of:-)

Witness
Name:
TONI RAVEN

Address:
24 POPLAR ST.
HEATON MERSEY
CHESHIRE SK4 3DG
Occupation:
STOCK ANALYST

EXECUTED AS A DEED by                        )
HOMESTEAD FABRICS LIMITED                    )

Acting by:

                                    Director

                                    ~~Director/Secretary~~

EXECUTED AS A DEED by                        )
GREENCO ENTERPRISES INC.                     )

Acting by:

                                    Director

                                    Director/Secretary

SIGNED AS A DEED by                          )
DAVID GREENSTEIN                             )
in the presence of:-                         )

Witness
Name:    KATIA UHLENDORF

            3 THE CIRCLE
Address:  GLEN HEAD, 11545, NY

~~NYDOCS1-743081.2~~NYDOCS1-743081.2

-11-

EXECUTION ORIGINAL

## AMENDMENT NO. 1 TO AGREEMENT

This AMENDMENT NO. 1 TO AGREEMENT (this "Amendment") is entered into as a deed on October 30, 2004 by and among HOMESTEAD FABRICS LIMITED, a private limited company incorporated under the laws of England and Wales ("HMST"), BROOME & WELLINGTON, a limited partnership existing under the laws of England and Wales ("B&W"), David L. Greenstein, an individual ("David"), Steven Greenstein, an individual ("Steven" and together with David, "GR"), Greenco Enterprises, Inc., a Delaware corporation ("Newco"), and HERKIMER DISTRIBUTION LLC, a New York limited liability company ("Herkimer").

The parties hereto hereby agree as follows:

1.     The parties hereto acknowledge and agree that certain provisions of the Agreement dated September 8, 2004 among the parties hereto, other than Herkimer (the "Homestead Acquisition Agreement"; capitalized terms used but not defined herein shall have the meanings set forth in the Homestead Acquisition Agreement), require clarification or modification in order to properly reflect the intentions of the parties to that agreement, and the parties hereto hereby agree that the provisions of the Homestead Acquisition Agreement referenced below shall hereby be amended as follows:

(a) The first sentence of paragraph 3 of the Homestead Acquisition Agreement is hereby amended by deleting such sentence and replacing it in its entirety with the following:

"HMST and B&W will cause Homestead Fabrics Inc., a Delaware corporation ("HFI"), to transfer all its assets, if any (including, without limitation, the rights to HFI's name), to Newco at the closing (concurrently with which transfer Newco shall make the Funding Payment pursuant to Clause 5 of Amendment No. 1 hereto) for no additional consideration. All liabilities of HFI (whether contingent or fixed, known or unknown, now existing or hereafter arising) are excluded from such transfer and shall be retained by HFI."

(b) The paragraph beginning "To the extent that..." in paragraph 4 of the Homestead Acquisition Agreement is hereby amended by deleting such paragraph and replacing it in its entirety with the following:

"The parties agree that in the case of any purchase order from any customer of Newco that will be filled, in whole or in part, with HMST Inventory, Newco will have the option of either:

(i) providing such customer with Newco's remittance address and purchasing from HMST the HMST Inventory that is shipped to fill such order by paying HMST an amount equal to the invoiced value of such HMST Inventory, which payment shall be made either in advance or on credit that is secured by an irrevocable standby letter of credit issued by Congress Financial Corporation (or another issuer reasonably satisfactory

to B&W) in an amount at least equal to the aggregate amount invoiced but as yet unpaid for such HMST Inventory or on credit arrangements that are otherwise reasonably satisfactory to Newco and B&W, in which case 100% of such payment by Newco to HMST will be credited to Newco against the Aggregate Amount, or

(ii) treating all the inventory that is shipped in respect of such order as if it were HMST Inventory and providing such customer with HMST's remittance address, in which case 100% of the proceeds from such customer with respect to such order shall be credited to Newco against the Aggregate Amount."

(c)  The parties agree that all amounts received by B&W or HMST or their respective affiliates with respect to HMST Inventory or HMST Receivables (whether such amounts are received directly from a customer, Newco or any other third party), including without limitation the proceeds of any insurance on the HMST Inventory, shall be deemed to be a payment of a portion of the Aggregate Amount by Newco to B&W in the amount of such payment.

(d)  (i)  The parties agree and acknowledge that, except as otherwise expressly stated in the Homestead Acquisition Agreement (as amended by this Amendment), none of Newco, GR, LFI or any of their respective affiliates will be responsible for (x) any obligations or liabilities (including, for the avoidance of doubt but without limitation, any obligations or liabilities in relation to tax, employees or for breach of contract) of whatever kind (whether actual or contingent) of HMST, Herkimer, HFI or B&W or (y) any other such liabilities or obligations that may have arisen from or in connection with the carrying on of HMST's business prior to July 31, 2004 (such obligations and liabilities described in (x) and (y) being collectively referred to as the "Retained Liabilities"); provided, however, that Retained Liabilities shall not include any contractual obligations or liabilities to suppliers and customers arising out of any acts or omissions of GR that B&W proves by a balance of the probabilities were taken without authorization or knowledge of B&W and outside GR's normal scope of authority (the "Excluded Liabilities"). HMST and B&W shall continue to be responsible for and shall promptly discharge in accordance with their terms all the Retained Liabilities.

(ii)  HMST and B&W represent and warrant to Newco that, since July 31, 2004, (x) HMST has not engaged in any activity other than the Ongoing Business (other than any activity that Steven or David may have caused HMST to take without B&W's authorization or knowledge and outside their normal scope of authority) (y) HMST has not incurred any liability or made any expenditure or payment other than in the ordinary course consistent with past practice (other than any expenditure, payment or liability that Steven or David caused HMST to make or incur without B&W's authorization or knowledge).

(iii)  HMST and B&W (the "Seller Indemnifying Parties") shall indemnify, hold harmless and defend each of Newco, GR and LFI and their respective affiliates (each, a "Buyer Indemnified Party") against all liabilities, losses, costs, claims and expenses suffered or incurred by any of them arising from or in connection with either (x) the Retained Liabilities or (y) any breach of the representations and warranties contained in the preceding clause (ii). Should any amount become payable to Newco pursuant to this paragraph, HMST and/or B&W, at their option, shall either: (A) promptly pay such entire sum to Newco; or (B) treat such amount as a

credit against the Aggregate Amount, and, to the extent that the amount payable to Newco under this paragraph exceeds the Aggregate Amount then remaining unpaid, promptly pay such excess to Newco.

(iv)  GR and Newco (the "Buyer Indemnifying Parties") shall indemnify, hold harmless and defend each of HMST and B&W and their respective affiliates (each, a "Seller Indemnified Party") against all liabilities, losses, costs, claims and expenses suffered or incurred by any of them arising from or in connection with the Excluded Liabilities. Should any amount become payable to HMST or B&W pursuant to this paragraph, Newco shall pay such entire amount to HMST and/or B&W.

(v)  As used in this paragraph, "Indemnified Party" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, and "Indemnifying Party" shall mean a Seller Indemnifying Party or a Buyer Indemnifying Party, as the case may be. In the event that any Indemnified Party becomes aware of a third-party claim which such Indemnified Party believes may result in a demand for indemnification pursuant to the preceding paragraph (iii) or (iv), such Indemnified Party shall, in the case of a Buyer Indemnified Party, promptly notify B&W of such claim and, in the case of a Seller Indemnified Party, promptly notify GR of such claim (provided that any failure to so notify B&W or GR, as the case may be, shall not relieve any applicable Indemnifying Party from any liability that such Indemnifying Party may have to an Indemnified Party except to the extent that such Indemnifying Party was actually prejudiced by such failure), and such Indemnifying Party, shall be entitled, at its expense, to assume the defense of such claim with counsel that is reasonably satisfactory to such Indemnified Party; provided, however, that (x) such Indemnifying Party, acknowledges in writing, upon assumption of such defense, its obligation to indemnify, defend and hold harmless the Indemnified Parties against such claim pursuant to the preceding paragraph (iii) or (iv), as the case may be, (y) the Indemnified Parties shall be entitled to participate in such defense at their own expense and (z) B&W or GR, as the case may be, shall not settle such claim without the consent of the Indemnified Parties, which consent shall not be unreasonably withheld and, further, provided that such Indemnifying Party, may settle such claim without such consent if (A) such settlement does not require any such Indemnified Party to admit any violation of law or other wrongdoing, (B) such settlement does not encumber any assets of such Indemnified Party or entail any restriction or condition that would apply to or adversely affect such Indemnified Party or the conduct of such Indemnified Party's business, (C) the Indemnifying Parties pay all amounts required to be paid under such settlement and (D) it is a condition to such settlement that the party making such claim provide such Indemnified Party with a complete and unconditional release in respect of such claim upon such settlement.

(vi)  Notwithstanding paragraph 5(ii) of the Homestead Acquisition Agreement, no amount that is payable in respect of the Ongoing Business for the period between July 31, 2004 and the Funding Payment (as defined below) shall result in an increase to the Aggregate Amount pursuant to such paragraph if such amount is actually paid directly by Newco or its affiliates.

(e)  The parties agree that no interest shall accrue pursuant to paragraph 7 of the Homestead Acquisition Agreement on any portion of the Aggregate Amount that has been paid.

2.      Herkimer is hereby joined as a party to the Homestead Acquisition Agreement and hereby agrees that it shall be bound by paragraph 10 of the Homestead Acquisition Agreement.

3.      B&W and Herkimer agree that they will enter into a letter agreement with LFI's senior lenders, in form and substance reasonably satisfactory to B&W and such senior lenders, containing customary provisions relating to any collateral securing LFI's senior debt that is located at the Herkimer Warehouse. Such letter agreement will not permit such senior lenders to treat any HMST Inventory as collateral securing such senior debt.

4.      Notwithstanding the references in the Homestead Acquisition Agreement (including in paragraph 21 thereof) to LFI and to a guaranty to be delivered by LFI, the parties agree and acknowledge that (i) no such guaranty shall be delivered by LFI or any other person pursuant to said paragraph 21 thereof, and LFI shall not become a party to the Homestead Acquisition Agreement, (ii) neither the Homestead Acquisition Agreement nor any of the transactions contemplated thereby is subject to the condition that such guaranty be delivered or that LFI become a party to the Homestead Acquisition Agreement and (iii) the Homestead Acquisition Agreement, as amended hereby, shall become binding and effective immediately upon the execution and delivery of this Amendment by all parties hereto. For the avoidance of doubt, the guarantee provided by Steven and David jointly and severally and set out in paragraph 22 of the Homestead Acquisition Agreement shall come into force and effect upon execution of this Amendment and shall also apply to any obligations set out in this Amendment.

5.      Immediately upon the funding of a $15 million mezzanine loan to LFI for working capital purposes (the "Funding"), but not later than thirty (30) days from the date hereof (and time is of the essence), Newco shall pay $2,000,000 to B&W (the "Funding Payment"), which sum shall be credited in full to Newco against the Aggregate Amount. Notwithstanding anything contained in the Homestead Acquisition Agreement and this Amendment, the Funding Payment will be made against the transfer of assets and liabilities from HMST and B&W to Newco contemplated by such agreement, and such transfer shall occur and become effective at the time of the Funding Payment. The Funding Payment and such transfer shall occur concurrently at a closing at which the parties shall execute and deliver any instruments required to effect such transfer. B&W, HMST and Herkimer agree to operate the Ongoing Business in the ordinary course consistent with past practice until such transfer.

6.      Until such time as Herkimer Warehouse is directly or indirectly transferred by HMST or B&W to any other party, Newco shall pay to HMST $300,000 at the end of each 12-month period following the transfer of assets contemplated by the Homestead Acquisition Agreement as compensation to HMST for the depreciation of the Herkimer Warehouse. Such payments shall be credited to Newco in full against the Aggregate Amount, and Newco shall not be required to make such payments to the extent that the Aggregate Amount has been paid in full.

7.      The parties acknowledge that HMST is not required to maintain credit insurance with respect to the HMST Receivables.

8.    Newco agrees to reimburse HMST for the cost of maintaining a T-1 line from September 1, 2004 until December 31, 2004, which cost shall in no event exceed £3,000 per month.

9.    The parties hereto intend that Newco will designate an affiliate that is currently wholly-owned by Newco to be the transferee of the assets and liabilities to be transferred pursuant to the Homestead Acquisition Agreement (as amended by this Amendment), which subsidiary will become a wholly-owned subsidiary of LFI upon such transfer.  HMST and B&W consent to such designation, provided that (x) such designee assumes all of Newco's liabilities under the Homestead Acquisition Agreement and this Amendment and(y) such designation shall not release David and Steven from their obligations as joint and several guarantors under the Homestead Acquisition Agreement as amended hereby.

10.    (a) Each of Joshua Rowe, HMST and B&W, on behalf of himself or itself and each of such party's controlled affiliates (the "Releasing Seller Parties"), hereby conditionally (but subject only to the last clause hereof commencing "on condition that") releases and discharges GR, Findhorn Limited, Newco and LFI and each of their respective affiliates, stockholders, officers, directors, employees and agents, and each of their predecessors in interest, successors, heirs, assigns, legatees and other representatives (the "Released Buyer Parties") of, from or with respect to any and all claims, rights, damages, demands, causes of action, judgments, debts, costs, losses, expenses (including attorneys' fees and expenses), dues, suits, obligations or liabilities of any nature whatsoever (collectively, "Claims"), (excepting only Claims against GR and Findhorn Limited based upon Excluded Liabilities), contingent or fixed, whether due or to become due, that such Releasing Seller Party had, now has or may have at any future time (including, without limitation, with respect to LFI's agreement with David Greenstein) with respect to the parties' prior dealings, other than with respect to obligations under the Homestead Acquisition Agreement and this Amendment; on condition that, if Newco or its assignees or successors shall fail to make any payments required to be made under the Homestead Acquisition Agreement or this Amendment (and such failure shall not have been cured within 10 days of receipt of written notice - by fax or e mail ) , such release shall terminate and become invalid and of no further force or effect (including retrospectively).

(b)    Nothing in paragraph 10(a) is intended to, and said subparagraph shall not be construed so as to , release GR and/or Newco from their agreement prior to the date hereof for the payment, of an additional  sum no greater than $ 125,000 (in  addition to the sums accrued within the $5.5 million of current liabilities on the books of HMST as of July 31, 2004, as referred to in paragraph 5 of the Homestead Acquisition Agreement,) of legal and accounting fees and expenses incurred by the Releasing Seller Parties in connection with documentation of the transactions contemplated by the Homestead Acquisition Agreement as amended hereby.

11.    Each of GR and Newco, on behalf of himself or itself and each of such party's controlled affiliates (the "Releasing Buyer Parties"), hereby conditionally (but subject only to the last clause hereof commencing "on condition that") releases and discharges Joshua Rowe, HMST and B&W and each of their respective affiliates, stockholders, officers, directors, employees and agents, and each of their predecessors in interest, successors, heirs, assigns, legatees and other representatives (the "Released Seller Parties") of, from or with respect to any and all Claims, contingent or fixed, whether due or to become due, that such Releasing Buyer

Party had, now has or may have at any future time with respect to the parties' prior dealings, other than with respect to obligations under the Homestead Acquisition Agreement and this Amendment (including the Retained Liabilities); on condition that that such release shall terminate and become invalid and of no further force or effect (including retrospectively) upon the termination of the release set forth in Section 10 as provided therein.

12.    Each reference in the Homestead Acquisition Agreement to "August 31, 2004" or "31 August" shall be deemed to be a reference to the business day immediately prior to the receipt by B&W of the Funding Payment. Each reference in the Homestead Acquisition Agreement to "September 1, 2004" or "1st September 2004" shall be deemed to be a reference to the date of such receipt of such payment. Each reference in the Homestead Acquisition Agreement to "August 2004" or "the month of August 2004" shall be deemed to be a reference to the period between July 31, 2004 and the date of such receipt of such payment (it being understood that the words "such month" in clause (ii) of paragraph 5 of the Homestead Acquisition Agreement shall also be deemed a reference to such period).

13.    Notwithstanding the references to LFI in the Homestead Acquisition Agreement and herein, the parties acknowledge that LFI is not a party to the Homestead Acquisition Agreement or this Amendment. Other than the permitted assigns and successors of the Parties hereto, a person who is not a party to this Amendment may not enforce any of its terms under the Contracts (Rights of Third Parties) Act 1999.

14.    The parties agree to jointly seek any third-party consents required in connection with the transfer of assets and liabilities contemplated by the Homestead Acquisition Agreement.

15.    This Amendment and the Homestead Acquisition Agreement shall be read and construed as one agreement. In the event of any conflict or inconsistency between the terms of this Amendment and the Homestead Acquisition Agreement, the terms of this Amendment shall prevail.

16.    This Amendment shall be governed by and construed in all respects in accordance with the Laws of England, and each party hereby submits to the exclusive jurisdiction of the English courts.

17.    This Amendment may be executed by facsimile and in any number of counterparts, but all of such counterparts shall together constitute but one and the same agreement. In making proof of this Amendment, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties thereto.

**IN WITNESS WHEREOF,** the parties hereto have caused this Amendment to be duly executed and delivered as a deed on the date first written above.

EXECUTED AS A DEED by )
**BROOME & WELLINGTON** )
acting by its general partner )
JOSHUA ROWE in the presence of:- )

*Witness:* D. Bl
*Name:* DOV BARRY BLACK
*Address:* 26 NEW HALL ROAD
*Occupation:* SALFORD
          M7 4HQ
          SOLICITOR

EXECUTED AS A DEED by )
**HOMESTEAD FABRICS LIMITED** )
acting by:

Director

Director/Secretary

EXECUTED AS A DEED by )
**GREENCO ENTERPRISES INC.** )
acting by:

Authorized Signatory

EXECUTED AS A DEED by )
**HERKIMER DISTRIBUTION LLC** )
acting by:

Authorized Signatory

EXECUTED AS A DEED by )
**DAVID L. GREENSTEIN** )
in the presence of:- )

*Witness:* D. Bl
*Name:* DOV BARRY BLACK
*Address:* 26 NEW HALL ROAD
*Occupation:* SALFORD
          M7 4HQ
          SOLICITOR

~~NYDOCS1-748286.7~~**NYDOCS1-748286.7**    7

EXECUTED AS A DEED by )
**STEVEN GREENSTEIN** )
in the presence of:- )

Witness:
Name:           Dov BARRY BLACK
Address:        24 NEW HALL ROAD
Occupation:     SALFORD
                M8 4TQ
                SOLICITOR

With respect to paragraph 10 only:

EXECUTED AS A DEED by )
**JOSHUA ROWE** )
in the presence of:- )

Witness:
Name:           Dov BARRY BLACK
Address:
Occupation:     AS ABOVE