Entered on Docket
July 05, 2006

_____
Hon. Bruce A. Markell
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

| | |
|---|---|
| In re:<br><br>PTI HOLDING CORP., a Nevada corporation, et al.,<br><br>Debtors.<br><br>———————————————————<br>HOMESTEAD HOLDINGS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>BROOME & WELLINGTON,<br><br>Defendant. | BK-N-06-50140 - BK-N-06-50146<br><br>Administratively Consolidated Under Case No. BK-N-06-50140<br><br>Chapter 11<br><br>Adv. Proceeding No.: 06-5051<br><br><br>Date: June 30, 2006<br>Time: 1:30 p.m. |

**Opinion on Motion for Preliminary Injunction**

**I.    INTRODUCTION**

In 2004, brothers Steven and David Greenstein acquired control of Homestead Holdings, Inc., the debtor and debtor in possession in this case. As part of that acquisition, Homestead bought assets from the defendant, Broome & Wellington. The Greensteins guaranteed the deferred portion of the price paid for the assets.

Soon after Homestead filed its chapter 11 case in March of 2006, Broome and Wellington filed a proof of claim in an amount just slightly in excess of $7 million in Homestead's case. Shortly after that, it sent a letter to the Greensteins indicating that it would fairly immediately file suit on all

guaranties and would, as the acquisition documents provide, file that lawsuit in England.[1]

Homestead then filed this adversary proceeding objecting to the proof of claim, and asserting various counterclaims. In addition, Homestead sought a preliminary injunction against Broome & Wellington's prosecution of any action on the guaranties. This request was based on two grounds: first, the full attention of Steven and David Greenstein, as Homestead's chief operations officer and chief executive officer, respectively, is necessary to Homestead's reorganization; and second, that prior determination of the guaranty claim in England would have adverse consequence on the determination of the proof of claim in this court. The requested injunction covers not only Steven and David Greenstein, but a company liable on the debt to Broome & Wellington, Greenco Enterprises Co., Inc., in which the Greensteins have significant ownership interests. The Greenstein brothers and Greenco are not debtors in this case.

The court will grant the preliminary injunction, but on fairly restrictive terms, which are more particularly detailed later and in a separate order.

## II.    FACTS

In support of its motion, Homestead filed Steven Greenstein's declaration before the hearing, and called both brothers and Marvin Toland, Homestead's chief financial officer, as witnesses. Broome & Wellington filed no declarations and called no witnesses. At closing arguments, the Official Committee of General Unsecured Creditors supported the request for an injunction (albeit one limited to a 60-day duration), and the major secured creditors concurred with that support.

A.    *Facts Related to the Acquisition of Homestead*

Steven and David Greenstein acquired Homestead in late 2004 through a series of transactions in which they also acquired the assets of London Fog Industries. Essentially, before the transactions, the brothers were co-owners with Broome & Wellington of Homestead Fabrics, Ltd. Their shares were split 35%/65%, with a corporation controlled by Steven and David Greenstein holding the 35% interest, and Broome & Wellington holding the remaining 65%. The brothers then caused their corporation to sell its 35% stake back to Fabrics, and Fabrics then agreed to sell a substantial portion of its assets to Greenco, or its designee. The acquisition agreement selected English law as its governing law, and contains a English choice of forum clause as well.

Under the acquisition agreement, Steven and David Greenstein guaranteed Greenco's obligations to pay the purchase price, as well as all of Greenco's other obligations. The guaranty is absolute (that is, it is not a guaranty of collection first requiring exhaustion of remedies against Greenco or its designee), and is governed by English law. As with the acquisition agreement, the guaranty is subject to an English choice of forum clause.

Greenco was initially set up as Homestead's parent, with negligible assets. As part of the acquisition by which Steven and David Greenstein acquired control of the London Fog brand, Greenco exchanged its shares in Homestead for an approximately 60% stake in a new holding company, London Fog Group. In addition, as part of these transactions, Homestead Greenco made Homestead Greenco's designee under the Fabrics' acquisition agreement. Homestead then assumed all of Steven and David Greenstein's and Greenco's obligations under that agreement.

---

[1]Broome & Wellington also accepted a position on the Official Committee of General Unsecured Creditors.

After these transactions, the brothers were the majority owners in London Fog Group and thus controlled Homestead, which became a wholly owned subsidiary of London Fog Group. Homestead controlled the textile business formerly run by Fabrics. Fabrics, along with Broome & Wellington, wound up with a debt owed by Greenco, which the Greensteins guaranteed and Homestead assumed.

Shortly after Homestead, as well as the other members of the London Fog Group, filed chapter 11 in March of 2006, Broome & Wellington (but not Fabrics) filed a proof of claim in Homestead's case indicating that the acquisition debt still owed was $7,018,710. One week after that proof of claim was filed, Broome & Wellington's solicitors sent a letter to the Greensteins and Greenco indicating that Broome & Wellington would begin legal action in England within a week if the Greensteins and Greenco did not satisfy the outstanding obligations under the guaranty by that time. Soon thereafter, Homestead filed this adversary proceeding. The court held the initial hearing and took testimony on June 13, 2006; closing arguments were made on June 30, 2006.

B.   *Facts Related to the Effect on the Greensteins' Time*

In both the initial declaration and the testimony, it is obvious that Steven and David Greenstein spend most of their waking hours working to reorganize the London Fog Group and Homestead. In the words of Mr. Toland, they are "classic workaholics," who are just as likely to send an email to co-workers at 2 a.m. as at 2 p.m.[2] By way of responsibilities, David Greenstein develops Homestead's products and sells them to customers, and Steven Greenstein buys the goods that they sell. Although sibling rivalry exists, the brothers convey the impression that they work together well, and respect each other's talents and contributions. Ultimately, all operational responsibility runs through them; in their own uncontradicted testimony, Steven and David Greenstein "are Homestead."[3] The brothers are also heavily involved in Homestead's reorganization efforts, and testified that it was possible that Homestead would file a plan of reorganization by year end.

Homestead itself has annual revenues of about $60 million, and is, according to David Greenstein, marginally profitable. It is growing at present, and currently has combined receivables and inventory of approximately $23 million. Steven Greenstein testified that Homestead currently has approximately 56 open orders, which covered more than a half million "units," or individual items.

Both brothers testified that spending any substantial time defending a lawsuit in England would have an adverse impact on Homestead. Steven Greenstein testified that if his personal involvement caused him to spend more time in England than planned, Homestead could miss delivery dates and lose orders and customers. Both brothers introduced their personal calendars for the next several months, which showed solid booking of business events and necessary international travel. In addition, most if not all of the personal wealth of the Greensteins is tied up in London Fog Group; if it or its constituent parts cannot reorganize, their testimony is that they have no way to respond or pay any judgment Broome & Wellington might obtain.

The testimony regarding Greenco revealed a less hectic schedule, but as Greenco is a holding company, that is to be expected. David Greenstein testified that he and his brother own about 75% to

---

[2] David Greenstein testified that his current work responsibilities occupy "most of the day that I'm awake. And I'm an insomniac."

[3] In response to questions about how much of their time would be necessary in the business, the response was that 100% of the brothers' time would be necessary until some planned asset sales in August, and thereafter perhaps 70% of their time would be required to run the debtor.

3

80% of Greenco along with five other minority shareholders. David Greenstein also testified that he understood that Greenco's debt to Broome & Wellington was the same as Homestead's, and that if Greenco were sued in England, he believed that Homestead would have to assist in the defense, since any adverse rulings in England might adversely affect the resolution of the proof of claim here. He also testified that if he or his brother were sued on their guaranty, Homestead would practically be compelled to defend, again given the possible effects on the proof-of-claim proceeding in this court.

C. *The Dispute*

Homestead stridently disputes Broome & Wellington's $7 million proof of claim. Indeed, it believes that instead of its owing money to Broome & Wellington, Broome & Wellington may owe Homestead up to $1.5 million. At the hearing, Homestead presented the barest of outlines of this dispute, and that outline was of a potentially long and complicated lawsuit. Broome & Wellington stands, and stands firmly, on the sanctity of their contract. It bargained for the right to sue the Greenstein brothers and Greenco separately and in England, and they contend it would be unjust to enjoin them from doing so. Although depriving them of that right, however momentarily, is a detriment, they have not shown any other specific prejudice if they are precluded from pursuing the guaranty litigation in England.[4] That is, they have not shown that any statute of limitations will run if they cannot file their litigation, or that the Greensteins or Greenco are likely to dissipate their assets during any period in which an injunction is in place.

### III. LEGAL ANALYSIS

Against this background, Homestead seeks to enjoin Broome & Wellington from filing and prosecuting a complaint in England against the Greensteins and Greenco. Applicable legal precedent supports their position.

A. *Applicable Standard for an Injunction Under Section 105 Against Preconfirmation Prosecution of Actions Against Nondebtors*

In the Ninth Circuit, "'[t]he standard for granting a preliminary injunction balances the plaintiff's likelihood of success against the relative hardship to the parties.'" *Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. Dep't of Agriculture*, 415 F.3d 1078, 1092 (9th Cir. 2005), *quoting* Clear Channel Outdoor, Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003).

Against this standard, the Ninth Circuit has recognized two sets of criteria that can be used to test the appropriate balance.

The first is a traditional test, under which "a plaintiff must show '(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases).'" *Ranchers Cattlemen*, 415 F.3d at 1092, *quoting* Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005).

The second test requires a plaintiff to show *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor." *Ranchers Cattlemen*, 415 F.3d at 1092, *quoting Save Our Sonoran*,

---

[4] At closing arguments, Broome & Wellington's counsel alluded to possible prejudice with respect to other parties. *See* note 7 *infra*.

4

408 F.3d at 1120 (emphasis in original).

The Ninth Circuit has repeatedly stressed that "'[t]hese two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. They are not separate tests, but rather outer reaches of a single continuum.'" *Ranchers Cattlemen*, 415 F.3d at 1092-93, *quoting Save Our Sonoran*, 408 F.3d at 1120.

Other sets of criteria apparently also meet the Ninth Circuit's continuum test. With respect to a request for a preliminary injunction seeking to uphold and enforce a prior order of the bankruptcy court, the Ninth Circuit has indicated that "our usual preliminary injunction standard does not apply to injunctions issued by the bankruptcy court pursuant to 11 U.S.C. § 105." Beck v. Fort James Corp (*In re* Crown Vantage, Inc.), 421 F.3d 963, 975 (9th Cir. 2005). Instead of the traditional requirements, "[t]he only requirement for the issuance of an injunction under § 105 is that the remedy conform to the objectives of the Bankruptcy Code." *Id.*

In support of this statement, the Ninth Circuit cited to the Seventh Circuit's decision in *In re L & S Industries, Inc.*, 989 F.2d 929 (7th Cir. 1993). There, state court litigants sought to enjoin their state court adversaries from pursuing counterclaims and defenses that had previously been determined by the bankruptcy court. After reviewing the traditional standards for granting or denying a preliminary injunction, the Seventh Circuit stated:

> [I]n order to issue a preliminary injunction, a court sitting in bankruptcy need not meet all three requirements outlined above [that is, lack of an adequate remedy at law, irreparable harm and a likelihood of success on the merits]. The Bankruptcy Act provides the court with broad equitable powers to preserve its own jurisdiction . . . . Accordingly, a bankruptcy court can enjoin proceedings in other courts when it is satisfied that such proceedings would defeat or impair its jurisdiction over the case before it. In other words, the court does not need to demonstrate an inadequate remedy at law or irreparable harm.

*Id.* at 932.

These decisions concerned existing orders. Here, however, the plaintiffs seek to enjoin Broome & Wellington in order to protect orders of this court yet to be entered. As a matter of jurisdiction and power, this court has the ability to enter such an order; there is little or no doubt that some actions against nondebtors could "defeat or impair" this court's jurisdiction," *In re L&S Industries*, 989 F.2d at 932, or make it unnecessarily difficult to achieve the "objectives of the Bankruptcy Code." *Crown Vantage*, 421 F.3d at 975.

But whether this court should exercise this power is a different question. Given the uncertainty of the connection between the actions sought to be enjoined and future orders of this court, a somewhat higher showing is required than simply adducing evidence that the remedy sought merely "conform[s] to the objectives of the Bankruptcy Code."[5] The English litigation's effects on this court's jurisdiction

---

[5] For this reason the court also rejects those cases under Section 105 that attempt to find "unusual circumstances" sufficient to impose a permanent injunction supposedly necessary to protect the postconfirmation effects of an order of confirmation. *See, e.g.*, Class Five Nevada Claimants v. Dow Corning Corp. (*In re* Dow Corning Corp.), 280 F.3d 648, 658-59 (6th Cir.), *cert. denied*, 537 U.S. 816 (2002); A.H. Robins Co. v. Piccinin (*In re* A.H. Robins Co.), 788 F.2d 994, 999 (4th Cir.), *cert. denied*, 479 U.S. 876, (1986). Moreover, "[i]n the Ninth Circuit, the vitality of the 'unusual circumstances' exception is not clear." Chugach Timber Corp. v. Northern Stevedoring & Handling Corp. (*In re* Chugach Forest Prod., Inc.), 23 F.3d 241, 247

over the proof of claim and on the debtor's executives are speculative, future events, while the entry of an injunction against prosecution is decidedly present and concrete.

To take into account the balancing required by *Ranchers Cattlemen*, this court adopts a modified version of the traditional standard for preliminary injunctive relief, first stated more than twenty years ago:

> The first requirement is that there be the danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize. Second, there must be a reasonable likelihood of a successful reorganization. Third, the court must balance the relative harm as between the debtor and the creditor who would be restrained. Fourth, the court must consider the public interest; this requires a balancing of the public interest in successful bankruptcy reorganizations with other competing societal interests.

*In re* Monroe Well Serv., Inc., 67 B.R. 746, 752-53 (Bankr. E.D. Pa. 1986). *See also* North Ala. Anesthesiology Group, P.C. v. Zickler (*In re* North Ala. Anesthesiology Group, P.C.), 154 B.R. 752, 764 (N.D. Ala. 1993); Otero Mills, Inc. v. Security Bank & Trust (*In re* Otero Mills, Inc.), 25 B.R. 1018 (D.N.M. 1982). 2 COLLIER ON BANKRUPTCY ¶ 105.02[2] (15th rev. ed., Henry Sommer & Alan Resnick, eds., 2006).

As COLLIER states, once the plaintiff has shown that the action against nondebtors will affect the bankruptcy estate in a legally cognizable manner,

> the most important element will be the balancing of harms. In this regard, the bankruptcy court, as a court of equity, has almost plenary discretion in fashioning the injunction so as to maximize protection and minimize prejudice. The court can condition the continuing effectiveness of the injunction on continued positive progress in the case, can require security to ensure a lack of harm to the creditor, or can require the protected individual to agree to restriction on the transfer of his or her assets.

2 COLLIER ON BANKRUPTCY, *supra*, at ¶ 105.02[2].

      B.    Monroe Well Service *Factors*

Homestead has the burden of establishing the various *Monroe Well Service* factors by a preponderance of the evidence. Chase Manhattan Bank v. Third Eighty-Ninth Assocs. (*In re* Third Eighty-Ninth Assocs.), 138 B.R. 144, 146 (S.D.N.Y. 1992); Stadium Mgmt. Corp. v. Connecticut Bank and Trust Co. (*In re* Stadium Mgmt. Corp.), 95 B.R. 264, 268 (D. Mass. 1988). Under *Monroe Well Service*, Homestead must show: irreparable harm to Homestead's estate or to its ability to reorganize; a reasonable likelihood of a successful reorganization; that there is an appropriate balance between the relative harm as between the debtor and the creditor; and that the injunction would be in the public interest.

           1.    <u>Irreparable Harm to the Estate or the Debtor's Ability to Reorganize</u>

Homestead must first establish an impact on the estate; or in the words of *Monroe Well Service*, whether there is a "danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize." *Monroe Well Service*, 67 B.R. at 752. It proffers two such intrusions. First, it contends that the threatened English lawsuit, if filed, would divert the Greensteins from their duties at

---

(9th Cir. 1994).

6

Homestead, to the detriment of Homestead's reorganization efforts. Second, it claims that determinations in any action in England would prevent this court from performing its duty in determining the issues between Homestead, which is the debtor in possession here, and Broome & Wellington. These effects are explored below.

### a. **Overburdening the Greensteins**

The testimony is uncontradicted that Steven and David Greenstein are each necessary to any successful reorganization of Homestead. It is also uncontradicted that diversion of the brothers' time would harm Homestead by depriving it of key players at a time that their services would be necessary in formulating a plan of reorganization, or in promoting or otherwise furthering Homestead's business.

Whether one sets the percentage of their time at 70% (once the sale of the London Fog trademarks are completed) or 100% (currently), the Greensteins are integral parts of the debtor's reorganization efforts. Any material diversion of their time or energies would result in a loss to the estate. In such cases, courts have easily found that the loss of such key participants at a crucial period in the operational life and reorganization of the debtor may constitute irreparable harm to the estate and to the reorganization effort. *See e.g., In re* M.J.H. Leasing, Inc., 328 B.R. 363, 368-69 (Bankr. D. Mass. 2005) (collecting cases). Lomas Fin. Corp. v. Northern Trust Co. (*In re* Lomas Fin. Corp.), 117 B.R. 64, 66-67 (S.D.N.Y. 1990) (granting injunction as non-debtor third party who spend "in excess of 50%" of his time on the debtor's reorganization); Lazarus Burman Assoc. v. Nat'l Westminster Bank USA (*In re* Lazarus Burman Assoc.), 161 B.R. 891, 899-900 (Bankr. E.D.N.Y. 1993) ("Because the [two] Principals are the sole participants in the Debtors' rehabilitation, they should be free to devote their full efforts to the operation of the business and the formulation of a plan. Because the Debtors are general partnerships owned and controlled solely by the [two] Principals, the [two] Principals are clearly the only persons who can effectively formulate, negotiate and carry out the Debtors' plan or plans of reorganization."); TRS, Inc. v. Peterson Grain & Brokerage Co. (*In re* TRS, Inc.), 76 B.R. 805, 809 (Bankr. D. Kan. 1987) (granting temporary injunction against guaranty litigation given that sole managing officer had all personal assets tied up in reorganizing debtor, and was otherwise unable to respond to any judgment in favor of beneficiary of guaranty); Kasual Kreation, Inc. v. Heller Financial, Inc., (*In re* Kasual Kreation, Inc.), 54 B.R. 915, 917 (Bankr. S.D. Fla. 1985) (granting temporary injunction for guarantors to allow them to focus on an upcoming retail season, the success of which was essential to debtor's reorganization); Northlake Bldg. Partners v. Northwestern Nat'l Life Ins. Co. (*In re* Northlake Bldg. Partners), 41 B.R. 231, 233-34 (Bankr. N.D. Ill. 1984) (injunction based on intimate connection between debtor's ability to reorganize and guarantor's critical management function with the debtor, and the lack assets other than those committed to or bound up in the reorganization).

### b. **Adverse Effect on Resolution of Claim**

Homestead also argues that litigation in England would adversely affect the resolution of Broome & Wellington's proof of claim here. That effect is both legal and practical. It is legal in that some application of claim preclusion (since the claim against Greenco is the claim Homestead assumed) or issue preclusion (since the Greensteins' guaranty is of the assumed debt). *See, e.g.*, Adelphia Comm. Corp. v. Associated Elec. & Gas Ins. Serv., Ltd. (*In re* Adelphia Comm. Corp.), 302 B.R. 439, 451 & n. 30 (Bankr. S.D.N.Y. 2003); American Film Technologies, Inc. v. Taritero (*In re* American Film Technologies, Inc.), 175 B.R. 847, 849-54 (Bankr. D. Del. 1994); MacDonald/Associates, Inc. v. Stillwagon (*In re* MacDonald/ Associates, Inc.), 54 B.R. 865, 869 (Bankr. D.R.I. 1985). *Cf.* Portage County Bank v. Deist, 159 Wis. 2d 793, 798-801, 464 N.W.2d 856, 858-60 (Wisc. Ct. App. 1990) (determination that debt satisfied in bankruptcy proceeding not binding on creditor in subsequent action involving guaranty of debt). It is practical because even if there is no claim or issue preclusion, devoting time and money to the English litigation, in which the issue are identical, would affect the manner of

prosecution of the proof of claim here.

The legal analysis brings into direct issue this court's ability to equitably distribute a debtor's assets. *See* Stellwagen v. Clum, 245 U.S. 605, 617 (1918) ("The federal system of bankruptcy is designed . . . [among other things] to distribute the property of the debtor, not by law exempted, fairly and equally among his creditors . . . ."). Broome & Wellington invoked and submitted to this court's jurisdiction by filing its proof of claim, and took further advantage of it by becoming a member of the unsecured creditors' committee. It thus cannot claim severe prejudice by being forced to delay its English litigation efforts; it had already started the claim resolution process in this court, of which this adversary proceeding is a logical extension.

But that is more a point about balancing harms than irreparable harm to the estate if Broome & Wellington were deprived of the ability to resolve the guaranty claims at a time of its choosing. Here, the claim that is sought to be litigated is identical in the proposed English action and in the proof of claim litigation. But are the parties sufficiently identical to invoke issue or claim preclusion? *Compare* RESTATEMENT (SECOND) JUDGMENTS § 59(3)(a) ("The judgment in an action by or against the corporation is conclusive upon the holder of its ownership if he actively participated in the action on behalf of the corporation, unless his interests and those of the corporation are so different that he should have opportunity to relitigate the issue") *with* RESTATEMENT (SECOND) JUDGMENTS § 59(3)(b) ("The judgment in an action by or against the holder of ownership in the corporation is conclusive upon the corporation *except* when relitigation of the issue is justified in order to protect the interest of another owner or *a creditor* of the corporation.") (emphasis added). *See* Bartle v. Health Quest Realty VII, 768 N.E.d 912, 918-21 (Ind. Ct. App. 2002) (guarantor of lease obligations bound to bankruptcy court's determination of amount owed under leases when guarantor owned 99% of the limited partnership interests in bankruptcy debtor).[6] An argument could be made that Homestead, as debtor in possession and estate representative, could ignore any English findings in order to vindicate the interests of creditors. But this court is not in a position to bind a later court in any use-of-claim or issue preclusion, in large part because the English litigation has yet to unfold, and the extent of actual participation of the parties in any such suit is an essential element to the issue preclusion point.

This issue becomes murkier because the court assumes that under principles of comity, this court would initially look to the issue and claim preclusive effect that English courts would give to any judgment obtained against the Greensteins or Greenco with respect to assessing that foreign judgment's effect on the proof of claim process. *See, e.g.*, Hilton v. Guyot, 159 U.S. 113 (1895) (Comity may entitle French judgment, as well as most foreign judgments obtained in a manner consistent with domestic notions of due process, to the same respect in the United States as a United States judgment would receive in the courts of that foreign nation); Gordon and Breach Science Publishers S.A. v. American Institute of Physics, 905 F. Supp. 169, 178-79 (S.D.N.Y. 1995).

But the extension of such principles of comity is, in some sense, discretionary. As one bankruptcy court stated the issue recently:

> [I]t must be recognized that neither the United States Constitution nor any statute of the United States requires federal courts to give full faith and credit to the judgments of foreign nations. Aetna Life Ins. Co. v. Tremblay, 223 U.S. 185 (1912). However, under the principles of international comity, United States federal courts generally will under some circumstances give effect to judicial acts of courts in foreign nations. *See*

---

[6]No opinion is expressed as to whether the identity of interest sufficient to apply claim or issue preclusion would be sufficient identity to extend the automatic stay. *Cf.* El Puerto de Liverpool S.A. de C.V. v. Servi Mundo Llantero S.A. de C.V. (*In re* Kmart Corp.), 285 B.R. 679, 688-89 (Bankr. N.D. Ill. 2002).

8

>Remington Rand Corporation-Delaware v. Business Systems, Inc., 830 F.2d 1260 (3d Cir. 1987), and Philips Medical Systems Int'l B.V. v. Bruetman, 8 F.3d 600 (7th Cir. 1993).
>
>The Supreme Court opinion in Hilton v. Guyot provides the guiding principles. Comity is defined as "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." Hilton v. Guyot, 159 U.S. 113, 163-64 (1895). Comity "is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Id*.

Herbstein v. Bruetman (*In re* Bruetman), 259 B.R. 649, 669 (Bankr. N.D. Ill.), *aff'd*, 266 B.R. 676 (N.D. Ill. 2001), *aff'd mem*, 32 Fed. Appx. 158 (7th Cir.), *cert. denied*, 537 U.S. 878 (2002). See also El Puerto de Liverpool S.A. de C.V. v. Servi Mundo Llantero S.A. de C.V. (*In re* Kmart Corp.), 285 B.R. 679, 691-92 (Bankr. N.D. Ill. 2002).

In a manner similar to the comity analysis, this court has the power under domestic law to control the application of claim or issue preclusion. *See* RESTATEMENT (SECOND) JUDGMENTS § 26(1)(2) (court in first action may make exception for claim preclusive effect in second action). Courts retain significant ability to vary from guidelines and principles to achieve fairness and justice; claim and issue preclusion are not ossified precepts and inflexible rules. *Id*. & com. c.

In the present setting, for example, this court need not side idly by and allow another court to make findings and judgments that would impair this court's jurisdiction. It could easily order that the English proceedings have no effect on the resolution of the proof of claim, in essence holding, in advance since the proof of claim was first filed, that claim and issue preclusion principles from any English proceeding will not to apply to the proof of claim resolution. *Id.*

Such a finding would protect and preserve this court's jurisdiction over the proof of claim, and thus minimize any claimed harm from the preclusive effects of the foreign litigation. But it would not assist Homestead; it would alleviate the demands such litigation would exact from the Greensteins and Greenco. Merely restricting the scope of issue and claim preclusion blinks the practical effect of allowing an English proceeding to be filed. This court is convinced from the testimony that any resolution of the amounts owed under the Fabrics acquisition agreement will be long, protracted and, to use a technical term, messy. The Greenstein brothers' time will be consumed in a dispute that, from Homestead's legitimate and reasonable point of view, is better resolved after a plan of reorganization is conceived if not confirmed. The loss of the time and talents of the Greensteins would bring about irreparable harm to Homestead.

### 2. Reasonable Likelihood of a Successful Reorganization

Little evidence was introduced regarding Homestead's reorganization efforts. On this point, *Monroe Well Service* requires that "there must be a reasonable likelihood of a successful reorganization." Here, the thrust of the evidence was that if Homestead were to reorganize, the full attention of Steven and David Greenstein would be necessary. Unfortunately, this evidence does not help establish this prong of the analysis. But the court can take note of the fact that in the four months since Homestead and London Fog Group filed, the debtors have moved swiftly to sell assets that were not productive and to focus on the core business – which will be Homestead's. This is not a "file and flush" case in which a debtor files, seeks a sale under Section 363 of the debtor's best assets, and then coverts to a chapter 7 after the sale so that someone else – a chapter 7 trustee – can clean up the resulting mess.

In addition, Homestead is a company that is marginally profitable, and substantial. It is a good candidate for reorganization. With such ingredients – an aggressive, proactive history while in bankruptcy, and a debtor with a potentially profitable operating business – Homestead should be given some time to develop a successful plan.

### 3. Balancing Harms

The evidence relevant to the first two elements of *Monroe Well Service* focus on the estate. But those interests must be balanced against the harms to the interests of the entities sought to be enjoined. Here, Broome & Wellington has an important interest that would be adversely affected by an injunction: the enforcement of bargained-for rights. J.C. Penney Co., Inc. v. Giant Eagle, Inc., 813 F. Supp. 360, 371 (W.D. Pa. 1992) ("There is a strong public interest in fair dealing between businesses and the solemnity of contracts; if commerce is to function smoothly, 'entrepreneurs must play by the rules.'"), *quoting* K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 916 (1st Cir. 1989). It is uncontradicted that the Greensteins and Greenco signed the documents that imposed liability upon them and that they are not debtors in this or any other court. Absent Homestead's filing, Broome & Wellington would enjoy almost unfettered discretion as to when to bring suit. Moreover, as indicated, this right was specifically bargained for; Broome & Wellington was not satisfied with the separate credit of Homestead. Now that its judgment as to Homestead's lack of creditworthiness has been vindicated, it would sting to unilaterally impose a delay on its right to sue the Greensteins or Greenco.

Monroe Well Service states this element as follows: "[T]he court must balance the relative harm as between the debtor and the creditor who would be restrained." As phrased, however, it is clear that this element overtly and consciously acknowledges that each party to the litigation has rights to be considered, and overly and consciously attempts to determine which of those rights is paramount. The court starts by noting that the relationship between the amount of Broome & Wellington's claim – approximately $7 million – and Homestead's operating assets and revenues – approximately $23 and $60 million, respectively – means that resolution of Broome & Wellington's proof of claim will have to be part of any reorganization strategy. Given that Broome & Wellington has submitted that proof of claim in this case, it is important that this court control the determination of the claim as part of its equitable adjustment of the claims of all creditors. As a result, some form of staying the English litigation would promote and enhance the prospect of a successful reorganization. Or, put negatively, if the English litigation proceeds unabated, the changes of a successful reorganization here are lessened.

Moreover, it was uncontradicted that the collective wealth of the Greenstein brothers and Greenco is tied up in London Fog Group and Homestead. Even if Broome & Wellington obtained a judgment in England, there would be nothing against which it could look for payment. Indeed, Broome & Wellington's collection success (assuming it prevailed on the merits) would appear to be enhanced by allowing London Fog Group and Homestead to reorganize. That is the only way that value will be created to pay any judgment.[7]

As a result, the required balancing tips in favor of Homestead. It needs and requires the undistracted attention of the Greenstein brothers more than Broome & Wellington needs to immediately

---

[7] Under such facts, a court could find that Broome & Wellington's proposal to litigate in England against guarantors who cannot respond to judgments is just a disguised method of proceeding against the the debtor on the essentially identical claim, which obviously would be a violation of the automatic stay of 11 U.S.C. § 362(a). Here, however, Broome & Wellington has argued (but introduced no evidence) that its purpose in litigating against the Greensteins and Greenco in England is to obtain a determination of default that is necessary for Broome & Wellington to pursue third parties. These third parties, under the Fabrics acquisition agreement, were to be released only after paying the full acquisition price for Fabrics' assets.

file its lawsuit. Any stay, however, need not, and indeed should not, be permanent. A short stay to allow Homestead to get its reorganization on track gives significant benefits to Homestead while not materially prejudicing Broome & Wellington.

    4.    <u>Public Interest</u>

When exercising the formidable power to issue injunctions, a court must always consider the public interest. Here, an injunction raises several public interest issues: the interest in successful reorganizations, the interest in international comity, and the interst in protecting the claims resolution process.

The public interest in successful reorganizations is significant. Rehabworks, Inc. v. Lee (*In re* Integrated Health Serv., Inc.), 281 B.R. 231, 239 (Bankr. D. Del. 2002); American Film Technologies, Inc. v. Taritero (*In re* American Film Technologies, Inc.), 175 B.R. 847, 849 (Bankr. D. Del. 1994). The Bankruptcy Code itself would be unnecessary if simple debt collection was the only legitimate interest; state law is perfectly sufficient to achieve that goal. But reorganization is a goal under the bankruptcy code and, as shown above, an injunction in this case furthers that goal.

But an injunction also adversely affects freedom of contract and, derivatively, international comity. At issue here is an injunction against enforcement of a contract governed by English law, which contains an English forum selection clause. Upholding any contract is an important public interest, *see, e.g.*, *J.C. Penney Co.*, 813 F. Supp. at 371 ("There is a strong public interest in fair dealing between businesses and the solemnity of contracts; if commerce is to function smoothly, 'entrepreneurs must play by the rules.'"), especially if an international choice of forum clause is involved. *See, e.g.*, The Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972),

The core concerns of these interests, however, are preserved if the court limits the duration of any injunction it enters, and ensures that Broome & Wellington is not prejudiced by any delay. A limited duration injunction simply postpones the vindication of the rights granted under the acquisition agreement. It does not destroy them.

Finally, not only is there a public interest in reorganization, but there is also an interest in the swift and just resolution of claims against bankruptcy debtors. *See* Wolinsky v. Maynard (*In re* Maynard), 269 B.R. 535, 542 (D. Vt. 2001) ("In addition to the important public interest in upholding the integrity of the bankruptcy system and preventing tainted compromise, there is a public interest in encouraging just, speedy, inexpensive, and final resolution of disputes.") An injunction here protects that core process, and allows it to function in the manner anticipated by Congress.

    C.    *Analysis*

Both sides have aptly pointed to Chase Manhattan Bank v. Third Eighty-Ninth Associates (*In re* Third Eighty-Ninth Associates), 138 B.R. 144 (S.D.N.Y. 1992) as an example of how to analyze the preliminary injunction standards in this case. There, a chapter 11 debtor owned some condominium apartments in New York City known as the Monarch, and owed approximately $10 million to Chase Manhattan Bank. Three individuals were involved in the management and operation of the debtor, Jacob Sopher, Kenneth LaSala and Thomas LaSala.[8] Sopher and the LaSalas had guaranteed approximately $1 million of that amount. Soon after the debtor filed, it sought to enjoin Chase's

---

[8]The debtor was a limited partnership. Its general partners were Jacob Sopher and LaSala 89th Street Development Company. This company, in turn, was a partnership whose managing general partners were Kenneth LaSala and Thomas LaSala.

11

prosecution of a prepetition lawsuit on the guaranty. *Id.* at 145.

The bankruptcy judge granted the injunction on the basis that the guarantors were each essential to the reorganization and had collectively offered conditional funding of the plan of reorganization. The injunction, however, was limited in time to the first four months of the case. *Id.* at 146.

On appeal, the district court upheld one of the injunctions, and reversed the bankruptcy court on the others. The injunction as to Thomas LaSala was upheld since the debtor produced evidence that supported a finding that he was "responsible for collecting rent and common charges, paying bills, making repairs, assuring that the building is rented to its highest capacity, conducting tenant relations, supervising building staff and acting as liaison with the board of the Monarch." *Id.* at 148. He spent "up to" 50% of his time on these activities and in "managing the debtor." *Id.* While the district court noted that "the 'key' nature of Thomas' role in the Debtor's business and reorganization may not have been established to the degree" discussed in other cases, "it was not clearly erroneous to conclude that the estate would be adversely affected if deprived of his services." *Id.* This, the court added, was a sufficient basis to find that the estate would suffer irreparable harm if Thomas continued to defend the lawsuit. *Id.* at 148 n.2.

The district court reversed as to Sopher and Kenneth LaSala. Unlike the case with Thomas, there was no documentary or direct testimonial evidence on Kenneth's level of participation in the debtor's business or reorganizational efforts. Without credible and direct evidence as to Kenneth LaSala's personal involvement, the district court found no basis for the injunction. *Id.* at 148.

Although the court found that Sopher would be "impaired" by continuing to defend the Chase guaranty action, it then found that the relevant party – the estate – would not. Sopher's primary contribution was setting policy, and the district court found no evidence in the record that continuing defense of the lawsuit would impair Sopher's contributions to the debtor in this regard. *Id.*

*Third Eighty-Ninth Associates* thus demonstrates each of the elements in a guarantor stay under 11 U.S.C. § 105(a). The district court correctly matched the claimed harm against the guarantors with the burden or harm to the estate. When the guarantors were personally inconvenienced in a way that did not harm the estate, the court found no basis for the injunctions. The court discounted the conditional offers of funding. Finally, the bankruptcy court properly limited the stay in the first instance for a short period. *See also* 2 COLLIER ON BANKRUPTCY, *supra*, at ¶ 105.03[1][a][iii] (analyzing *Third Eighty-Ninth Associates*).

In this case, when the appropriate balancing is done, Homestead has made out a sufficient case for a limited injunction. As in *Third Eighty-Ninth Associates*, diverting key personnel – here Steven and David Greenstein – would irreparably harm Homestead's reorganization process. Although Homestead has not shown that a successful reorganization is likely, it has shown that it is a likely candidate for such a reorganization, and that it has taken significant steps to achieve such a reorganization. Against this, Broome & Wellington has insisted on its important and indisputable contract rights, but it has not shown any real prejudice from any delay in filing an English proceeding. While the public interest in the sanctity of contract and the respect due to foreign proceedings is high, it is counterbalanced by the local interest in reorganization and the speedy resolution of claims. Again, as in *Third Eighty-Ninth Associates*, a limited duration for the injunction preserves the principle benefits of these rights for Broome & Wellington while allowing Homestead to reorganize.

As a result, an injunction is appropriate, but only on terms that balance the interests listed above.

D.   *Terms of the Injunction*

Based upon the factors and analysis above, this court will issue an injunction that will expire on the effective date of any plan confirmed in Homestead's case or on December 31, 2006, whichever comes first. While the injunction is in effect, the Greenstein brothers and Greenco may not transfer any of their assets except in the ordinary course of business (as, as applicable, in the ordinary course of their personal affairs) without prior written notice to (or prior written consent of) Broome & Wellington or after court approval with prior notice to Broome & Wellington. In addition, to the extent that any limitations or other similar period may run or expire between or among the parties during the pendency of the injunction, that limitation or other period shall be extended.

## IV. CONCLUSION

Injunctions are not lightly granted, and the benefits of bankruptcy are not casually extended to nondebtors. Here, however, Homestead has shown that diversion of its two key executives, David and Steven Greenstein, would cause irreparable harm to Homestead's business and to its reorganization prospects, and that pursuit by Broome & Wellington of its guaranties of Steve and David Greenstein and Greenco would cause such a diversion. In addition, the harm to Broome & Wellington, by losing its unfettered right to pursue its guaranties, is less concrete, and can be ameliorated by an appropriately crafted injunction. When all the evidence is surveyed, Homestead has thus met the standard for obtaining a preliminary injunction.

This opinion constitutes the court's findings of facts and conclusions of law in accordance with FEDERAL RULE OF BANKRUPTCY PROCEDURE 7052, and constitutes the separate reasons for entering an injunction in accordance with FEDERAL RULE OF BANKRUPTCY PROCEDURE 7065. An order embodying the specific terms of the injunction will be separately entered in accordance with FEDERAL RULE OF BANKRUPTCY PROCEDURE 7065 and FEDERAL RULE OF BANKRUPTCY PROCEDURE 9021.

Copies sent to:

Talitha B. Gray, Esq.; tbg@gordonsilver.com bankruptcynotices@gordonsilver.com

Brian A. Jennings, Esq.; bjennings@perkinscoie.com; MLMaag@perkinscoie.com

Kaaran Thomas, Esq.; kthomas@beckleylaw.com

Gerald Gordon, Esq.; gmg@gordonsilver.com

Augie Landis, Augie.Landis@usdoj.gov

Nick Strozza, Esq.; USTPRegion17.RE.ECF@usdoj.gov

Stephen Harris, Esq.; steve@renolaw.biz

Alan Smith, Esq.; adsmith@perkinscoie.com

Harry H. Schneider, Esq.; hschneider@perkinscoie.com

# # #